Case, Cerro Flow, 509-0253. Council, please. May it please the Court, Council. My name is Theodore Powers, and I represent Cerro Flow v. Avalon. This is another repetitive trauma claim involving a partial rotator cuff tear of the claimant's left shoulder. We have two basic issues here. One, whether the evidence proved that the claimant sustained a repetitive trauma injury, which manifested itself on June 10, 2004. Second issue, whether there was a causal relationship between the accident on June 10, 2004, and the partial rotator cuff tear, which turned up on MRI two years later. Last night, I'm sitting here prepping for these arguments. You were not sitting here, though, were you, last night? No, not here. And I'm looking at the arbitrator's decision, which is the basis of this appeal, because it was affirmed by the Commission. And I was struck by the arbitrator's total and complete disregard of the claimant's testimony and the medical evidence, which refuted both the accident date as well as causal connection. In terms of the accident date, it's like I'm reading this decision going, so what was the basis for finding an accident date on June 10, 2004? And that was pretty easy to figure out from reading this. She essentially stated or relied upon a history that was obtained by Dr. Dusak from the claimant two and a half years after the fact. And also, it happened to be Dr. Dusak happened to be a patient that the Commission didn't look at by their adoption. The claimant's testimony that if he had received treatment in April 2004, then the June date was not correct. They ignored the petitioner's testimony of having shoulder pain due to a specific incident of lifting. They ignored the petitioner's saying that he reported the injury to his supervisor at the time the injury occurred and immediately started treatment. Now, that's consistent with the specific incident. They ignored, or the arbitrator and the Commission, they ignored the fact that he saw a family doctor on May 17, 2004 and gave a history that he sustained an injury to his shoulder while lifting on April 13, 2004. And that was a history that was later repeated to our IME physician, Dr. Layman. So, I'm not sure how we came up with the date of June 10, 2004. The manifestation date, what happened on that date? Now, it's according to the testimony from this record. But, that's it. And there was no treatment at that point in time, nothing else. You read the rest of this decision, this arbitrative decision, and if you had never, if you just looked at the decision and none of the evidence in this case, you wouldn't know by looking at this that the first type of treatment that the arbitrator talks about in supporting this decision is treatment two and a half years later by Dr. Giuseppe. She makes reference to treatment in September of 2006 by the family doctor. There's only one document that's mentioned in this decision from 2004, and it's an MRI. The MRI of the shoulder was performed in 2004, which, by the way, didn't reveal any evidence of any tears of the rotator cuff. Well, to get back to your question, I'll bring some notes here. You asked a rhetorical question, why was June 10, 2004 considered to be the date of the accidental injury? Didn't the claimant testify, he notified his supervisor on June 10, 2004 that he had increasing pain in his left shoulder, and he felt the repetitive lifting of the head and quads, the date on which he becomes, and it becomes clear to a reasonable person that it's work-related. So isn't that sufficient for the commission to believe him? Well, that would be fine, except on cross-examination, he was questioning about, you know, if he had treatment before then, and he made it very clear. If, in fact, I had gone for treatment prior to June, and I was getting treatment for my shoulder, the accident didn't happen in June. What happened was, at least from my view, regardless if he's a poor historian or whatever, he, I mean, there's no question that he had a shoulder injury at work in April. I don't think we dispute that, all right? What we have here is him giving his history in June, and then saying right after he told his supervisor, he went to Memorial Hospital and got his medical treatment, and then he went to his company doctor. Those facts are true, but they occurred in April. Look at the document. In April, and the evidence, in April, he reported an accident, he went to the emergency room, Memorial Hospital, and he went to his Correct. So, maybe at that point, he's thinking it's arthritis. It's got nothing to do with anything until June. But I don't know when, I'm not sure when the thing came out with arthritis, but it wasn't on June the 10th. He didn't have treatment on June the 10th. But it was earlier than that. Didn't he testify, the company doctor told him? The company doctor said he had arthritis after the MRI in July of 2004. Okay. Okay. But it was also at that point in time that he checked his shoulder and they looked for the tear, or if there were any tears, and there weren't any. All right? So, we don't have in this decision anything from 2004 other than the MRI, and of course the doctor in April and May. No mention that he was undergoing physical therapy prior to June 10th. No mention that he'd seen his family doctor on May 17th of 2004. No mention that he was actually on light duty at the time, in June of 2004, which is the basis of repetitive trauma. He was doing these repetitive activities in June of 2004. He's on light duty because he's already under treatment. All right. In all of this, I would have to, now, it goes, you're arguing, to undercut the credibility of the claimant, correct? I'm actually cutting the credibility. I don't believe that we have a decision here that is based upon a fair viewing of the evidence. There is not a, this is not a fair viewing of all the evidence, or is it to manifest weight, and an opposite conclusion must be clearly apparent to Oscar Wolfert. I think it's really apparent when you have a petitioner who, even though on direct, says one thing about it occurred in June, or on June the 10th. Mind you, he filed the application first saying June the 1st and amended it to June the 10th. But, who gets on direct and says that, and then, no sooner than we get back to, and it's repetitive trauma, then, on cross, he says, well, if I had treatment in April, then April's the date. And, if I asked him about, was this a specific incident, he agreed with it. It was a specific incident. So, we have repetitive trauma caused it June 10th on direct, and now he flips. I think what we really have going on here, we have a gap in having a resolution of his symptoms in August of 04. He's got other problems. He's going to his doctor 16 times. He'd already told his family doctor that he had shoulder problems. Now they resolve in August. We have a two year gap, 16 visits, not one mention about his shoulders bothering him. That's significant. We have an MRI two years after this. After the first MRI, we have another MRI. Now we have a partial tear. And, now we have a referral by the attorney to this doctor who is being relied upon slowly for the opinions here, and for setting up a date of accident in June of 2004, who is saying that, oh, he had a tear back in 2004. He didn't look at the MRI film. He didn't look at any medical records back there to note that he had problems in April. It was due to a specific accident. And, the commission believed him. Well, the majority did. I think it was very clear from the dissent of Commissioner Biserto that the MRI in 2004 totally contradicts Dr. Dusick's opinion. There's no tears in 2004. Laman gives a contrary opinion on causation, and it's against the Manifest Way. But, it still comes back to, how do we get a date of accident of June the 10th? If he's getting treatment in April, I don't care if the commission said we find that it happened on June the 10th. If all the evidence says this happened in April, then that's clearly against the Manifest Way. I understand the Manifest Way is a really tough nut to crack here. I've been here many times, and I know that it's difficult. But, based on this record, this record, there is nothing to support the date of accident, unless you want to rely upon the flawed or inaccurate histories that were provided to Dr. Dusick. Other than that, the other evidence clearly shows that's wrong. That date of accident is wrong. Now, we've got a problem with the causation opinion as well. Because, the April incident that occurred, it happened in April. It was a specific incident. So, Dr. Dusick talking about the repetitions and overhead use of his arm doesn't mean anything. It was a specific incident. Counsel, in a repetitive trauma case, what is your understanding of the date of accidental injury? It's the manifestation date. The date when it became apparent to a reasonable person. Maybe it didn't become apparent to him in April, because the company doctor says you've got degenerative arthritis. Well, that didn't occur, in the evidence, that didn't occur until July. So, if he was going to hand that epiphany, if you will, that would have occurred in July for a manifestation date, because he didn't know. Setting aside that, it still has to come down to the reasonable person. So, you say, how could it be in June? Maybe that's when he realized it was connected to the work activities. Then why did he testify at trial that if he had treatment in April, it occurred, the date was in April. Then why did he say that? It doesn't make any sense to me, your honor, when the gentleman is put on cross-examination and he's told, well, you had treatment in April. And he says, well, if that's when I had my treatment, then the accident was in April. So, then the June date just goes out, doesn't it? I mean, I know it's rhetorical, but you can sit there and say that. Well, does the commission have to rely just on the claimant, or can they rely on the totality of the evidence in arriving at an accident date? But, the point is that this accident date, he didn't say that it was, you know, this is when I learned about this. It was the date that he said, the date that was selected, June 10th, was based on him reporting it to his supervisor. Right. Right. But he said, I reported it to my supervisor, I went to Memorial Hospital, and I went to the company doctor the next day. That happened on April 14th or 15th. That's when that occurred. So, he could have testified that in June 10th, that's when he said he realized it was connected to the lifting of the airway? He never testified to that. He did not. He may have given a history, I believe, to Dr. Dusik, but he did not testify that he knew on that date that it was related to his appointment. All right, so he gives a history to Dusik, he testifies before the arbitrator, and there's an inconsistency of their conflict. Is it up to the commission to resolve the conflict? Well, but they didn't. They just ignored all this. There's not even a discussion about there being a – when you read this, there isn't even a conflict. That there wasn't even his testimony that refuted what he had testified to on direct. That what he had told his family doctor, that it happened on April 13th. And by the way, if he's going to have a manifestation of some injury, why would he tell his doctor on April 13th, I injured myself lifting on that day? That makes no sense. What happens here, quite simply, is we have a gentleman who did in fact have an accident and involved his shoulder. He had a strain of his shoulder. He had conservative treatment. He went around and MRI was negative. It resolved. Two and a half years later, two years later, he starts having problems with his shoulder. He has a new MRI. And now he's got a tear. And now we have his doctor trying to extrapolate or go backwards and backdoor this into a repetitive trauma claim when it was clearly a specific incident on April 13th. That's all that's going on. You know what? I see these cases. I know that you can look at the evidence and you have to weigh it, and it's a difficult process. But under these facts, I think that it is undisputed that it's against the manifest way of the evidence. I would ask that the court prefers. Counsel, please. May it please the court. Mary Massa here for Bobby Huddleston, the employee in this case. I think a resolution of this issue with the was he injured in April, was he injured in June, maybe will turn upon the instruction that the Supreme Court gave in the Duran case. The court said, to always require an employee suffering from a repetitive trauma injury to fix as the date of accident, the date the employee became aware of the physical condition, presumably through medical consultation, and its clear relationship to the employment, is unrealistic and unwarranted. And the court further said that because repetitive trauma injuries are progressive, the employee's medical treatment, as well as how severe the injury was,  are relevant in determining objectively when a reasonable person would have plainly recognized the injury and its relation to work. So regardless of any problems with history that the petitioner may have had in saying, I told Mr. Trammell on June 10th versus I told him after I first sought medical treatment in April, if that's when I first sought medical treatment, I think that's irrelevant. If we look at the medical treatment that this claimant had, beginning in April of 2004, and how it affected his performance at work. This particular claimant had a job as a ferns packer. He was a left-handed individual. And starting in January of 04, he and another individual would take these coils of copper that came off the line every 15 to 30 seconds and stack them on skids 25 high. This would require him to push when it's above shoulder level to get those coils up there. This is the repetitive motion that injured the shoulder. Now, did he go to seek treatment in April? Yes, he went to the emergency room. The next day he went to the company doctor. But interestingly enough, those notes from April 15th, the employee did not complain of or describe any specific history of an accident. Now, let's look at what happened after that. The company doctor did prescribe some physical therapy. He did go on with physical therapy. But interestingly enough, at that initial April 15th office visit, the company doctor did not take him off of his job doing this hand packing. So if this was a concern to the company doctor about the shoulder,  based on the symptoms that he was complaining of at the time, he was only complaining of some pain in his left shoulder and his neck. Now, as time goes on and as physical therapy progressed, he wasn't getting any better. He saw his family doctor. He had that physical therapy for 12 weeks. Now, April 30th, he began complaining to the company doctor that, excuse me, on May 21st he complained to the company doctor that he was having pain traveling down his arm, left arm, and going numb into his fingertips. This is quite a bit more severe in symptomology than initially complaining of pain in his neck and his shoulder. Despite being taken off of overhead work sometime around that period of time, the employee complained to his family doctor on June 2nd of 04 that he was having persistent pain in his left shoulder, causing numbness and insomnia, and that he needed to follow up with the company doctor about the shoulder. June 4th, he saw the company doctor, and the employee reported that he had slow and deliberate range of motion, prepotence with resumption of dependent position after elevation, and the company doctor believed that he might need injections at that point in time. At June 18th visit with the company doctor, the employee complained he was not doing any better despite the therapy, and it was at that time that the company doctor believed, well, maybe we ought to get some further diagnostic tests to find out what's going on. So if you look at the progression of the symptomology from April 13th of 04 to this period of time at or about June 10th, which is what the arbitrator said was the manifestation date, you can see how this particular claimant's condition worsened. And interestingly, and importantly, he was continuing to work at least for a portion of the period of time following the initial symptoms in his shoulder and his neck. Now the MRI that was done in July of 04, that is what the respondent is hanging their hat on, or at least their IME examiner, Dr. Lehman, that there was no partial tear of the rotator cuff as was found quite specifically on the 2006 MRI prior to Dr. Dusik doing surgery on that shoulder. But Dr. Dusik did not believe that the MRI done in 2004 was relevant whatsoever to a determination of whether or not there was a partial tear in existence in 2004 at or around June 10th of 2004. Dr. Dusik testified that that MRI showed sequences of the left sternoclavicular joint but not the complete shoulder. And there was also an x-ray done about the same time in July of 04 that was only of the left clavicle. So the area of this tear, which was at the supraspinatus tendon, in Dr. Beatty's opinion, that MRI would not have shown that area of the shoulder and therefore was completely irrelevant. I'm sorry, Dr. Dusik, yes. So in terms of causation and in terms of this gap of treatment, as was pointed out earlier, after that MRI was done, the company doctor is saying, hey, you just have arthritis in your shoulder. So what's he supposed to do? He is on a light-duty job at this point in time. He's tying coils. It doesn't require any lifting. He continues to perform that job until January of 2005. And then he's moved to a production assignment where he's using his shoulders, but it's at shoulder level. He's feeding coils into a conveyor system. But from time to time, production would slow down and he was required to go back to that hand-packing furnace job, which required him to lift. And so from time to time, he would have some symptoms in his shoulder, but nothing that was serious enough to require him or cause him to want to go and seek medical treatment. He did testify, though, that the production slowdowns, which would force him to have to go back to that hand-packing job, they were short-lived, not like the initial assignment from January of 2004 until he was taken off of that work by the company doctor sometime in May of 2004, based on the evidence. He didn't have that duration of having to perform that particular job that apparently was aggravating his shoulder. But symptoms progressed. And Dr. Dusik testified that with a partial tear, you're going to have waxing and waning of symptoms. And in the fall of 2006, he was having symptoms, which Dr. Dusik said even the feeding of the coils onto the conveyor system, that would stress the shoulder, maybe not as much as lifting overhead, but Dr. Dusik did tie that onto a progression of his symptoms. The MRI showed the partial tear, and Dr. Dusik did the surgery. The causation is supported by Dr. Dusik's opinions in this case, which the arbitrator and then the commission majority have affirmed and adopted. And there is, in the petitioner's estimation, sufficient evidence to support that causation opinion by Dr. Dusik. I believe that's all I have to say. Was there any questions that anyone had? No. Thank you, Kathy. Thank you very much. Mr. Vettel? Just briefly. The only record that Dr. Dusik had was the report, MRI report. He didn't look at the film. So he can sit there and read from the report and say, well, this is irrelevant, as he testified at his deposition, by just reading the report. He needed to look at the film like Dr. Lehman did. It is an MRI of the shoulder. So I am sure that when you do an MRI of the shoulder, you're going to capture the shoulder joint and the rotator cuff area. Dr. Lehman testified. He looked at the film. There were no tears in 2004. Counselor made a comment about him having these progressive difficulties with his shoulder up through June. Let's not forget the fact that he had a resolution of his symptoms in August. And then two years, 16 visits, quackling and waning. What does resolution mean to you? That he was cured, that it was no longer an issue, or he was no longer lifting above his shoulder? He told the doctor that he was no longer having any motor, functioning problems with that shoulder. He was doing fine. And the last thing I just want to mention to you, in terms of this manifestation date, I don't have, obviously, the record in front of me. I have the transfer proceedings. But a couple of questions that were asked of him. First one is when he was going to see Dr. Michai. That's the first name of the family doctor. And I asked him, and you also told him of his work injury while lifting in April of 2004? Yes. Just as an aside, at one time you saw Dr. Layman and he evaluated you? Yes. And you gave him a history of hurting your shoulder while lifting in April of 2004? Yes. Okay. Your left shoulder wasn't bothering you before April of 2004? No. All right. So it was a specific incident in April when you felt that pain? Right. And that activated you going for treatment? Yes. And it activated you, obviously, reporting the accident to CERO? Yes. That's not a manifestation date. June. That's a specific accident. Oh, and one last comment. He was asked if it was a specific incident, and he said yes. It was a specific incident of lifting. That's not a manifestation date. That is an accident date. It's certainly not June the 10th. Thank you, Ron. Thanks, counsel. The court will take the matter under advisement for disposition. We'll stand at recess until that.